IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATALIE Y. ACTON,

                     Plaintiff,

      v.

CAROLYN COLVIN, Commissioner,
Social Security Administration,

                 Defendant.

No. 1:13-cv-00185-HZ

OPINION & ORDER

John E. Haapala, Jr.
Haapalaw LLC
Law Office of John E. Haapala, Jr.
401 E. Tenth Avenue, Suite 240
Eugene, OR 97401

      Attorney for Plaintiff

S. Amanda Marshall
United States Attorney
Ronald K. Sliver,
Assistant United States Attorney
U.S. Attorney's Office
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

Heather L. Griffith
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Natalie Y. Acton brings this action for judicial review of the Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the following reasons, I reverse the Commissioner's decision and remand for further administrative proceedings.

BACKGROUND

      Ms. Acton was born in 1966 and was 39 years old at the alleged onset of disability. (Tr. 107.) She completed the ninth grade and reports past work in assembly, delivery, and as a substitute U.S. Postal Service worker. (Tr. 133, 128.) On April 3, 2006, Ms. Acton tripped and fell while delivering papers. (Tr. 370.) On April 5, 2006, Ms. Acton visited her primary care provider, Dr. Richard Williams, and complained of constant pain in her knee, leg, and ankle. (Tr. 292.) Dr. Williams diagnosed a sprained left ankle and bruised left knee. Id. X-rays performed on April 2006 showed no fracture or bony lesion, normal alignment, and unremarkable soft tissue. (Tr. 295.) On May 31, 2006, Ms. Acton saw Dr. Douglas Morrison who noted her leg appeared morphologically normal, with no swelling, no obvious changes in skin appearance, and no edema. (Tr. 242.) Dr. Morrison gave a "working diagnosis of regional pain syndrome versus mechanical derangement" in the knee, and ordered an MRI. Id. Ms.

Acton's MRI, conducted on June 2006, showed no abnormalities in the knee, except for "mild but nonspecific marrow edema, and mild narrowing of the articular cartilage compartment consistent with only mild chondromalacia," also known as runner's knee.  (Tr. 244.)  Dr. Morrison then referred Ms. Acton to Dr. Mark Greenberg, a pain specialist.  (Tr. 242.)

Dr. Greenberg examined Ms. Acton on July 20, 2006, and noted her knee was not discolored or swollen.  (Tr. 474.)  Dr. Greenberg found "some crepitans[1] to palpation over the patella ligament and suprapatellar bursa."  Id.  He found no tenderness to palpation, no texture changes on the affected skin, and no unusual patterns of swelling, hair, or nail growth.  Id.  Dr. Greenberg remarked that Ms. Acton's signs and symptoms were consistent with complex regional pain syndrome ("CRPS"), and recommended a nerve block.  Id.

The next day Ms. Acton saw yet another doctor, Dr. Sheila Algan, who reported no swelling on the leg, but noticed a "slight dusky appearance."  (Tr. 255.)  Dr. Algan found some "fairly advanced quadriceps atrophy," but otherwise described the exam as "fairly unremarkable."  Id.  Dr. Algan indicated probable CRPS with deconditioning in the left leg.  Id.  Dr. Algan noted she "concur[red] with Drs. Morrison and Greenberg," and recommended physical therapy.  (Tr. 256.)

On August 31, 2006, Ms. Acton saw Dr. Joseph Savino.  (Tr. 458.)  Ms. Acton explained having pain, and suffering hypersensitivity to light and touch on her knee.  Id.  Dr. Savino's physical examination revealed no appreciable color difference, no edema, and no difference in temperature between Ms. Acton's knees.  Id.  Dr. Savino wrote that Ms. Acton demonstrated "overdramatized pain behavior."  (Tr. 459.)  His pain assessment showed "inconsistencies" with

---

[1] Crepitans or crepitus refers to the crackling, crinkly, or crunching sound under the skin heard when the ends of a fractured piece of bone rub against each other.  http://medical-dictionary.thefreedictionary.com/crepitus

her reported pain and his physical examination.  Id.  She was significantly anxious, and demonstrated "somatic preoccupation," which "magnif[ied] her symptoms greatly."  Id.

Ms. Acton visited another physician, Dr. Michael Narus, on November 6, 2006.  (Tr. 262.)  Dr. Narus recorded her reports of severe pain in her left knee and the beginning of pain in her right knee.  Id.  Dr. Narus found some tenderness to palpation on the left knee, but he "doubt[ed]" the presence of reflex sympathetic dystrophy.[2]  (Tr. 263.)  Dr. Narus referred Ms. Acton for an electrodiagnostic evaluation.  Id.

Dr. Peter Grant performed the electrodiagnostic test.  (Tr. 267.)  Although Ms. Acton continued to report pain in her left knee, the exam showed no acute, chronic, or old abnormalities of the muscle membranes or motor units.  (Tr. 268.)  All additional electrodiagnostic results showed Ms. Acton's left leg was normal.  Id.  Dr. Grant reported that while some of Ms. Acton's symptoms might suggest CRPS, he could not find objective evidence to support such a diagnosis.  (Tr. 269.)  Dr. Grant found no temperature change and no color or trophic skin changes in any area of her left leg.  Id.  He stated that Ms. Acton had no atrophy and explained such muscle loss would be present if she had significant CRPS for the previous five or six months.  Id.

Ms. Acton returned to Dr. Williams, her primary care physician, twice in July and August of 2007.  (Tr. 287-90.)  The medical reports from both visits reflect Ms. Acton's complaints about leg pain, but again, the physical exam revealed no abnormalities.  Id.  Finally, on April 25, 2008, Ms. Acton saw Dr. Zakir Ali, who noticed Ms. Acton did not have the classical manifestations of CRPS.  (Tr. 283.)

Ms. Acton filed a claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act") on June 10, 2009, (Tr. 107) and on June 17, 2009, she applied for

---

[2] Reflex Sympathetic Dystrophy ("RSD") is an alternative name for CRPS.  SSR 03-2p, 2003 WL 22399117, *1 (Oct. 20, 2003).

Disability Insurance Benefits ("DIB") under Title II of same Act.  (Tr. 111.)  Ms. Acton alleges

disability since April 3, 2006, due to CRPS.  (Tr. 107, 111, 127.)  The Commissioner denied her

disability insurance benefits claims on November 12, 2009[3], and upon reconsideration on

February 9, 2010.  (Tr. 46, 53.)  On August 23, 2011, Ms. Acton appeared at a video hearing

before an Administrative Law Judge ("ALJ").  (Tr. 25.)  On September 21, 2011, the ALJ found

Ms. Acton not disabled.  (Tr. 19.)  The Appeals Council declined review of the matter on

December 6, 2012, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1.)

## SEQUENTIAL DISABILITY ANALYSIS

The Act defines "disability" as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result

in death or that has lasted or can be expected to last for a continuous period of no less than twelve

months."  42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A) (2012).  The ALJ engages in a five-step sequential

process to determine whether a person is disabled under the Act.  20 C.F.R. §§ 404.1520, 416.920

(2013).  Each step is potentially dispositive.  At step one, the ALJ determines whether the claimant is

engaged in substantial gainful activity.  If so, the claimant is not disabled; if not, the analysis moves

to step two.  20 C.F.R §§ 404.1520(b), 416.920(b) (2013).  At step two, the ALJ determines whether

the claimant has one or more severe impairments.  If not, the claimant is not disabled; if so, the

analysis continues.  20 C.F.R §§ 404.1520(c), 416.920(c) (2013).  At step three, the ALJ determines

whether the claimant's impairment "meets or equals" one of the impairments listed in the Social

Security Administration ("SSA") regulations, 20 C.F.R Part 404, Subpart P, Appendix 1.  If so, the

claimant is disabled.  If the claimant's impairment does not meet or equal one listed in the

regulations, the analysis moves to step four.  20 CFR §§ 404.1520(d), 416.920(d) (2013).

---

[3] Although the record shows the SSA denied Ms. Acton's SSI and DIB claims on November 12, 2009,  Ms. Acton subsequently requested reconsideration only on her DIB claim.  (Tr. 51.)  Since Ms. Acton does not seek review of her Title XVI claim, I will address only her Title II claim.

If adjudication proceeds beyond step three, the ALJ must first evaluate the medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The RFC is an assessment of work-related activities the claimant may still perform on a sustained basis, despite the claimant's impairments. 20 C.F.R. §§ 404.1520(e), 416.920(e) (2013); Smolen v. Chater, 80 F.3d 1273, 1291 (9th Cir. 1996); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). Assessing a claimant's credibility regarding his or her symptoms and their functional effect is part of the RFC determination when the record establishes the existence of a medically determinable impairment that could reasonably give rise to the claimant's reported symptoms. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006). The ALJ uses this information to determine whether the claimant can perform his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). If the claimant cannot perform his or her past relevant work, the analysis moves to step five where the ALJ determines whether the claimant is able to do any other work in the national economy considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g) (2013).

The burden to show disability rests with the claimant at steps one through four, but if the analysis reaches step five, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant could perform. Tackett v. Apfel, 180 F.3d 1094, 1098-1100 (9th Cir. 1999). The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part. 404, Subpart. P, Appendix 2. Id. at 1101. If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can perform, then the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 CFR §§ 404.1520(g)(1), 416.920(g)(1) (2013).

THE ALJ'S DECISION

At step one, the ALJ determined Ms. Acton did not engage in substantial gainful activity during the period from the alleged onset date of April 3, 2006, through her date of last insured, June 30, 2007. (Tr. 12.) At step two, the ALJ noted that Ms. Acton alleged three conditions: CRPS, depression, and anxiety. Id. In evaluating her asserted impairments, the ALJ considered opinions from various treating and examining medical professionals. (Tr. 12-15.) The ALJ found the evidence in the record supported the medically determinable impairments of depression and anxiety, but not CRPS. (Tr. 12.) The ALJ found Ms. Acton did not have a severe impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months. (Tr. 15.) Accordingly, the ALJ determined at step two that Ms. Acton was not disabled within the meaning of the Act. (Tr. 19.)

STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)). The reviewing court may not substitute its judgment for that of the Commissioner. Id. (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)); see also Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence is susceptible to

more than one reasonable interpretation, the court must uphold the decision.  Andrews, 53 F.3d at 1039-40.  However, this court cannot now rely upon reasoning the ALJ did not assert in his or her decision.  Bray, 554 F.3d at 1225-26 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

DISCUSSION

Ms. Acton alleges the ALJ erred by finding she did not have the medically determinable impairment of CRPS.  Plaintiff's Opening Brief ("Pl. Br.")  5.  Specifically, Ms. Acton asserts the ALJ: (1) improperly discredited Ms. Acton's subjective testimony; (2) did not properly consider the lay testimony of her husband, Dave Acton; and (3) improperly rejected medical evidence from her treating physicians and specialists.  Id.

I.  Credibility Determination

Ms. Acton argues the ALJ failed to provide clear and convincing reasons for discrediting her testimony.  Pl. Br. 12-13.  She alleges the ALJ's reasons for discrediting her testimony are not based upon substantial evidence.  Id. at 12.  In deciding whether to accept a claimant's subjective testimony, an ALJ must perform a two-step analysis.  Smolen, 80 F.3d at 1281.  First, the claimant must produce objective medical evidence of an underlying impairment or impairments that could reasonably be expected to produce pain or other symptoms.  Id. at 1281-82.  If the claimant meets this threshold and there is no affirmative evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering clear and convincing reasons.  Id. at 1281, 83-84.

Here, the ALJ provided a number of reasons for discounting Ms. Acton's credibility: (1) her overdramatized pain behaviors; (2) inconsistent examination findings; (3) her vague or erroneous reports of her medical condition; (4) her refusal to engage in prescribed physical

therapy and avoidance of medications; (5) her daily activities were not as limited as one would

expect; and (6) her work history of very low earnings.  (Tr. 15-17.)

 First, the ALJ discounted Ms. Acton's testimony because of her overdramatized pain

behaviors, inconsistent examination finding, and inconsistent reports regarding her medical

condition.  (Tr. 13-14, 16.)  An adjudicator may discredit the claimant's allegations based on

inconsistencies in his or her testimony.  Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991).

The Ninth Circuit has upheld a negative credibility finding where the claimant was a vague

witness with the alleged period of disability and pain symptoms.  Tommasetti v. Astrue, 533

F.3d 1035, 1040 (9th Cir. 2008).  In this case, the ALJ considered Dr. Narus' report, which

concluded Ms. Acton gave a "rather vague" historical account of her symptoms.  (Tr. 14.)  The

ALJ also relied on Dr. Savino's findings, which recorded Ms. Acton's "overdramatized pain

behavior, and some inconsistencies on examination."  (Tr. 14.)  This evidence supports the ALJ's

conclusion that Ms. Acton's symptoms were largely psychological.  Id.

 The ALJ also discredited Ms. Acton's credibility because she refused to engage in

prescribed physical therapy and avoided recommended medications.  (Tr. 13-14, 16.)  An ALJ

may infer that a claimant's pain was not as disabling as reported if the claimant did not seek an

aggressive treatment program or a more-tailored treatment after stopping an effective medication

due to mild side effects.  Tommasetti, 533 F.3d at 1039.  Here, the ALJ observed Ms. Acton

refused Dr. Greenberg's recommended nerve block treatment.  (Tr. 13.)  As to physical therapy,

Dr. Algan prescribed a regimen of home exercises and requested a follow up visit in six weeks.

Id.  Dr. Savino prescribed aggressive physical therapy and a follow up visit in four week.  Id. at

13-14.  But there is no evidence in the record showing that Ms. Acton followed up with any of

those recommendations.  Additionally, Ms. Acton's medical records show she either

discontinued or never took prescribed medication.  (Tr. 14, 16.)  These are also clear and convincing reasons for discrediting Ms. Acton's testimony.

The ALJ found Ms. Acton's overall work history showed very low earnings, which suggested sporadic employment.  (Tr. 17, 119.)  He noted Ms. Acton never made more than $12,000 in a year, and the sum of her earnings in the twenty-five year period prior to her disability onset date averaged less than $3,000 per year.  Id. at 17.  This is a valid reason for discounting a claimant's credibility.  See, e.g., Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2001) (upholding the ALJ's finding that a claimant's poor work history "negatively affected her credibility regarding her inability to work"); Yaws v. Comm'r Soc. Sec. Admin., No. 3:12-CV-02063-MA, 2014 WL 693478, *3 (D. Or. Feb. 21, 2014) (noting that a claimant's yearly income, which ranged from $5,000 to $10,000 per year, showed little propensity to work and holding the ALJ correctly found the claimant's poor work history undermined her testimony); Moore v. Astrue, No. CV-08-1567-RC, 2009 WL 1330856, at *6 (C.D. Cal. May 13, 2009) (finding the ALJ correctly relied on claimant's poor work history to support an adverse credibility determination).

Finally, the ALJ discredited Ms. Acton's credibility because her daily activities were not as limited as one would expect.  (Tr. 16-17.)  A claimant's credibility may be discounted if the claimant's activities contradict her testimony.  Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  Additionally, the ALJ may reject a claimant's credibility if a claimant is able to spend a substantial part of her day performing physical functions that are transferrable to the work setting.  Id.  However, disability claimants should not be "penalized for attempting to lead normal lives in the face of their limitation." Reddick, 157 F.3d at 722.

I find the ALJ erred in concluding that Ms. Acton's daily activities, such as watching television, making jewelry, and visiting family, were not consistent with her alleged limitations. (Tr. 17.)  The Ninth Circuit has repeatedly asserted that a claimant's simple daily activities, such as grocery shopping, driving a car, or limited walking for exercise do not detract from her credibility regarding overall disability.  E.g., Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001); Fair, 885 F.2d at 60; Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987).  This error is, however, harmless because the ALJ gave many other clear and convincing reasons supported by substantial evidence for discrediting her testimony.

In sum, the ALJ gave multiple legally sufficient reasons for discrediting Ms. Acton's credibility.  The ALJ's error in analyzing her daily activities does not affect the validity of the ALJ's analysis here, because the ALJ's other reasons for discounting Ms. Acton's credibility are clear and convincing, and supported by substantial evidence.

II.  Lay Testimony

Ms. Acton argues the ALJ did not provide at least one specific, germane reason for dismissing the lay testimony of her husband.  Pl. Br. 16.  Lay testimony about a claimant's disability is competent evidence that the ALJ cannot disregard without comment.  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009).  Moreover, in CRPS cases, third-party information is often critical to analyzing an individual's credibility.  SSR 03-2p, 2003 WL 22399117, *7. Although SSRs do not carry the force of the law, they are binding on ALJs.  Bray, 554 F.3d at 1224.  They reflect the official interpretation of the SSA and are entitled some deference.  Id. (citing Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006)).  Third-party information helps in evaluating an individual's ability to function on a day-to-day basis and depicting the individual's capacities over a period of time, thus establishing a longitudinal picture of the

individual's status.  SSR 03-2p, 2003 WL 22399117, *7.  Nonetheless, the ALJ may properly

reject lay testimony similar to a claimant's subjective complaints when the ALJ provides clear

and convincing reasons for rejecting the claimant's own testimony.  Valentine v. Comm'r Soc.

Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009).

      Here, the ALJ stated Mr. Acton's third-party function report and post-hearing letter "did

not alter [his] conclusion." (Tr. 17.)  SSR 03-2p clearly instructs the ALJ must consider third

party information, including evidence from relatives, to help assess an individual's ability to

function on a day-to-day basis and information that helps to depict the individual's capacities

over a period of time.  SSR 03-2p, 2003 WL 22399117, at *7.  The ALJ had a duty to explain

why Mr. Acton's testimony did not alter his conclusion.  Bruce, 557 F.3d at 1115 (explaining

that lay testimony cannot be disregarded without comment).  The ALJ did not provide any

reason, much less a specific or germane one, to justify dismissing Ms. Acton's testimony.  The

ALJ's failure to do so must be addressed on remand.

      III.  CRPS Severity Determination

      Finally, Ms. Acton alleges the ALJ erred by finding she did not have the medically

determinable impairment of CRPS at step two.  Pl. Br. 6-7.  Step two "is a de minimis screening

device used to dispose of groundless claims." Smolen, 80 F.3d at 1290.  At step two, the ALJ

assesses whether the claimant has a medically severe impairment or combination of impairments

that significantly limit his or her ability to do basic work activities.  Webb v. Barnhart, 433 F.3d

683, 686 (9th Cir. 2005).  An impairment or combination of impairments may be found not

severe only if the evidence establishes a slight abnormality, which has no more than the minimal

effect on a claimant's ability to work.  Id.  If an adjudicator is unable to clearly determine the

effects of an impairment or a combination of impairments on the claimant's ability to perform

basic work activities, the sequential evaluation should not end at step two.  Id. at 687.  A court reviewing a denial at step two must determine whether the ALJ had substantial evidence to clearly establish the claimant lacks a medically severe impairment or combination thereof.  Id.

The Ninth Circuit has distinguished between signs and symptoms.  Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005).  Symptoms are an individual's own perception or description of the impact of her physical impairments, while signs are present when any of the individual's manifestations are anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical diagnostics techniques.  Id.

SSR 03-2p indicates a finding of CRPS constitutes a medically determinable impairment when documented by the appropriate medical signs, symptoms, and laboratory findings.  SSR 03-2p, 2003 WL 2239917, at *2.  A finding of CRPS requires complaints of persistent, intense pain that result in impaired mobility of the affected region.  These subjective complaints of pain must be associated with at least one objective finding of:

- Swelling;
- Autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), skin temperature changes, or abnormal pilomotor erection (gooseflesh);
- Abnormal hair or nail growth (growth can be either too slow or to fast);
- Osteoporosis; or
- Involuntary movements of the affected region of the initial injury.

SSR 03-2p, 2003 WL 22399117, at *2.

The ALJ stated that "on balance, the evidence did not establish the existence of a medically-determinable case of CRPS."  (Tr. 14.)  In order to reject Ms. Acton's claim at step two, the ALJ needed to explain how the medical evidence clearly established her impairments did not limit her ability to perform basic work activity.  Because there is ambiguity in the

medical evidence and the ALJ did not explain the reasoning behind his conclusion, the ALJ's decision is reversed and remanded for further administrative proceedings.

A review of the medical evidence shows Ms. Acton presented many symptoms of CRPS, i.e., her own reports and perception of the impact of her physical impairments.  For example, Ms. Acton saw Dr. Williams two days after her accident and complained of constant pain in her knee, leg, and ankle.  (Tr. 292.)  Dr. Morrison, whom she visited a month later, noted Ms. Acton "winc[ed] even with light touch over knee area."  (Tr. 242.)  Next, Dr. Greenberg reported Ms. Acton's subjective complaints as "ongoing knee pain," and she described an "ongoing inability to bear weight on the left side."  (Tr. 474.)  Finally, Dr. Savino recorded Ms. Acton's relayed "having hypersensitivity to light touch" and severe pain.  (Tr. 458.)

A claimant may not establish a medically determinable physical impairment based on symptoms alone, but symptoms combined with one objective medical sign are sufficient to move the analysis past step two.  Ukolov, 420 F.3d at 1005.  In other words, the ALJ can only reject Ms. Acton's claim at step two if the medical records are devoid of any objective signs of CRPS, and that is not the case here.  Both Dr. Algan and Dr. Greenberg found two signs that could support a finding of CRPS.  Dr. Algan reported Ms. Acton's leg had a "slightly dusky appearance," (Tr. 255) and Dr. Greenberg found "some crepitans to palpation."  (Tr. 474.)  As explained above, the ALJ did not provide any reasons for rejecting this evidence.

These objective signs, combined with Ms. Acton's reported symptoms, are sufficient to satisfy step two's "de minimis screening" for groundless claims.  Ortiz v. Comm'r of Soc. Sec., 425 Fed. Appx. 653, 655 (9th Cir. 2011) (explaining that affirming a preemptive step two denial requires a "total absence of objective evidence").  The ALJ did not explain the significance of these findings, or why the other medical evidence in the record contradicting Dr. Algan's or Dr.

Greenberg's report was entitled to more weight.  The ALJ must explain the reasoning that

supports his conclusion that Ms. Acton did not have severe impairment.

Accordingly, this case is remanded for further administrative proceedings consistent with

this opinion.  I must clarify, however, that this holding does not suggest Ms. Acton will prevail at

step two, or any other step in the sequential disability analysis.  The court simply holds that the

ALJ did not sufficiently explain how the conflicting medical evidence in this case "clearly

established" that Ms. Acton did not suffer from a medically-determinable case of CRPS.

CONCLUSION

For the reasons provided above, the Commissioner's decision is  reversed and remanded

pursuant to Sentence Four of 42 U.S.C. § 405(g) for further administrative proceedings.

IT IS SO ORDERED.

Dated this _____ day of _____, 2014

MARCO A. HERNANDEZ
United States District Judge

15 – OPINION & ORDER